UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NO.

_____

JOHN LEONELLI; ANNE LEONELLI

     individually and as class representatives
     on behalf of all others similarly
     situated

        Plaintiff

v.

WACHOVIA MORTGAGE, FSB

        Defendant
_____

**COMPLAINT /
CLASS ACTION COMPLAINT**

**PARTIES**

1.     Plaintiffs reside at 3 Huckleberry Hill, Lincoln, Middlesex County, MA 01773.

2.     The Defendant corporation ("Wachovia") is a citizen of Nevada with a usual place of business at 843 Worcester Rd, Natick, Middlesex County, MA 01760 .

3.     Defendant is the successor-in-interest by merger to World Savings Bank. By such merger, Defendant assumed all the assets and liabilities of World Savings Bank who was the origination lender on the subject home loan of this Action: World Savings Origination Loan #0026359976 in the loan amount of Loan Amount: $495,000 a closing date of 08/02/2004.

## JURISDICTION

4.    The amount in controversy exceeds $75,000 exclusive of interest and costs.

5.    This Court has jurisdiction over this action pursuant to *28 U.S.C. §1332.*

6.    This Court is proper venue for this Action pursuant to *28 U.S.C. §1391* because the property at issue in this Action is situated in this Court's jurisdiction and the Defendant is subject to personal jurisdiction in this District.

## FACTS

7.    Wachovia is the successor-in-interest by merger to World Savings Bank ("World"). By such merger, Wachovia assumed all the assets and liabilities of World Savings Bank who was the origination lender on the subject home loan of this Action. The subject loan violates numerous state and federal regulations and required standard of care for underwriters and lenders. A summary of these violations is attached.

8.    Most importantly, however, the subject loan is a predatory loan in violation of multiple state and federal regulations. World placed the Plaintiffs in a loan with an initial payment based on an artificially low interest only payment based on a rate that is much lower than the actual note rate of the loan. The result is that the payment is insufficient to pay the interest that is accruing at the actual note rate. The difference is added to the unpaid principal balance until the original loan amount reaches 125% of original loan amount. This effect is referred to as negative amortization. According to the estimated payment stream disclosed on the Final TIL, the

payments could increase by 144% after the first 60 payments. The payments could increase by 167% after 96 payments. This type of loan is of no benefit to the borrower and in fact jeopardizes the borrowers' ability to repay the loan. Lenders who place borrowers in these types of loans do so only for their own benefit.

9.      The subject financing of the Leonellis' home occurred through what World Savings Bank called its "Pick-a-Payment" loan program that is more commonly known in the business of financing as Payment Option Arms (POAs).  Wachovia is the successor in interest to World Savings by merger.

10.     POAs were intentionally designed to result in negative amortization and obligations to pay compound interest. These loans seemed attractive and were made attractive to consumers by World Saving's deceptive and unfair advertizing because of the low initial payments and the prospect of refinancing in a few years after equity was built up in a home primarily after appreciation in the home value.  What the deceptive advertizing hid from all consumers was that if appreciation did not occur or interest rates went up instead of down during even the beginning history of the loan that refinancing would not be an option either because the home did not appreciate or because interest rates increased.  The low monthly payments do not cover the interest cost and the remainder interest gets added to the value of the loan.  So, the amount owed actually goes up over time and can easily surpass the value of a house in a zero money down situation.

11.     The Leonellis' case is typical and characteristic of all POA's given by World . In short, the POAs were designed to make fully amortizing payments unaffordable to the Leonelli's and to other consumers making the Leonellis' and all other consumers' ability to pay-off the loan completely dependent on Wachovia's willingness to temporarily or permanently restructure their

loans.

12.     POAs have been aggressively pressed on to unsophisticated borrowers as a way to borrow more money with temporarily and artificially low monthly payments.  Nearly $750 billion in these loans was issued between 2004 and 2007 according to  Ruth Simon, Option Arms See Rising Defaults, *Wall Street Journal*, A1, January 30, 2009. POAs are a substantial cause of defaults and foreclosures.  *Id*; Susan E. Barnes, Patrice Jordan, Victoria Wagner & David Wyss, *Standard & Poor's 12*, Standard & Poor's Weighs in on the U.S. Subprime Mortgage Market (Apr. 5, 2007) (increase in early payment defaults within four months of origination), available at www2.standardandpoors.com/spf/pdf/ media/TranscriptSubprime_040507.pdf. As of December 2008, 28% of option ARMs were delinquent or in foreclosure, according to LPS Applied Analytics, a data firm that analyzes mortgage performance.  Nearly 61% of POAs originated in 2007 will eventually default, according to a recent analysis by Goldman Sachs.  Goldman further estimates that more than half of all POAs originated in any year will default.  Ruth Simon, Option Arms See Rising Defaults, *Wall Street Journal, A1* January 30, 2009.

13.     The combination of negative amortization and forced payment restructuring including interest coming due on unpaid interest results in significantly higher payment obligations thirty to sixty months after loan consummation. POA loans are complex.  They involve concepts that are unfamiliar and confusing to most, even fairly sophisticated, homeowners.  See e.g. Consumer Fed'n. of America press release, Lower-Income and Minority Consumers Most Likely to Prefer and Underesttimate Risks of Adjustable Mortgages 3, July 26, 2004, (consumers cannot calculate the interest in the payment in an adjustable rate mortgage and minimize the interest rate by understating the increase in the payment) available at http://www.consumerfederation.org/ releases.cfm#Consumer%20Literacy; Business Week, Nightmare Mortgages (Sep. 11, 2006) (option ARM "might be the riskiest and most complicated home loan produce ever created")

available at http://www.businessweek.com/magazine/content/06_37/b4000001.htm.

14.    Lenders, including World Savings, made these loans knowing that borrowers cannot afford the fully indexed rate or the anticipated fully amortizing payments.  Subprime Mortgage Market Turmoil:  Examining the Role of Securitization, Hearings Before the S. Comm. On Banking, Hous., & Urban Dev., 110th Cong. (2007) (statement of Sandor Samuels, Executive Managing Dir., Countrywide Fin. Corp.) (60% of borrowers from Countrywide could not qualify at the fully indexed rate).  Seven Sloan & Joe Adler, How Freddie Cutbacks in Hybrids May Reverberate, Am. Banker, Feb. 28, 2007 (quoting Wright Andrews, a lobbyist for nonbank lending institutions, as saying that most subprime borrowers cannot afford the fully indexed rate and requiring underwriting to the fully indexed rate would prevent adjustable rate mortgages from being made).

15.    On information and belief, hundreds of Massachusetts homeowners have POAs originated by World Savings and now owned by Wachovia that will ultimately require payments that those homeowners cannot afford.  Many of those borrowers have been subjected to various loan modification agreements that hide the above unfair and deceptive practices and require payment of interest on interest together with substantial costs and fees to avoid foreclosure. The subject adjustable rate notes have the following deceptive features:  1) a statement that the interest rate on the loan would be at a "yearly rate" when any such stated rate would only be in effect for less than a few months; and 2) a failure to admit that the stated  payments would lead to negative amortization thereby triggering a complicated annual payment change regime that could only lead to substantial and unmanageable upward-only payment changes.

16.    Based on information in its possession, World Savings knew or should have known that consumers who could not afford payments that would amortize the loan would ultimately either

require further refinancing, forced sale of the property, or default. The interest rate is based on a margin and an index that the Defendant has unlimited discretion to change at will.  Use of the term "Index" is deceptive in that the Index is not fixed by then or any present "current" market conditions and remains, at all times relevant to this Action, entirely within the control of the World Savings and/or its successors in interest under the loan note. World Savings knew or should have known that the note language describing the Index would be impenetrable to its average customer.

17.     Moreover, it knew that borrowers would not be able to obtain information to evaluate the index in order to compare a World Savings Loan to other available loan products.  Nor would customers, in light of the possibility of a change to an alternative index, rely on available information about the index. Thus, the Leonellis' and other World Savings customers were deprived of an opportunity to understand the consequences of a World Savings Loan, could not comparison shop, and could not evaluate the likely cost of future mortgage payments under the loan as designed. The note language was designed to obscure the actual rate that would be applied to the transaction so that typical borrowers, such as the Plaintiff, would be forced to focus on the temporary interest rate and the deceptive advertizing. Thus, the note is deceptive and intended to deceive about the interest rate applicable to the transaction. In addition, the note is unfair in that World Savings retained discretion to change the Index to its advantage at any time. Wachovia has exercised that discretion.

18.     The note is unfair in the circumstances because it binds the Plaintiff and other consumers to a loan structure they could not understand. The payment change provisions of the note are complex and interrelated. World Savings knew or should have known that this language concerning payments would be impenetrable to its average customer. The note language was designed to obscure the actual payments that would be due to amortize the loan in the transaction

so that typical borrowers, such as the Plaintiff, would be forced to focus on the initial payments that would be in effect for only a short time (and which would result in negative amortization requiring an upward payment adjustment). The note is deceptive and intended to deceive with respect to the amount of monthly payments. The note is also unfair because it deprives typical borrowers, such as the Plaintiff, of information necessary to evaluate their long-term ability to amortize the debt.

19.     World Savings and Wachovia, as its successor, knew that negative amortization would increase the loan balance and make payments ultimately unaffordable leading to pressure on the Plaintiffs  to refinance or to default to put his home on the market for a forced sale.

20.     It is an unfair and deceptive act under Massachusetts law for a lender to make a home mortgage loan secured by the borrower's principal residence in circumstances where the lender does not reasonably believe that the borrower will be able to make the scheduled payments and avoid foreclosure. World Savings owed the Plaintiff and other similarly situated borrowers a duty of care to underwrite the loan by considering whether the loan could eventually be paid off by amortizing payments. Rather than underwrite the loan properly, World Savings considered only whether the Plaintiff and other similarly situated borrowers could make the initial monthly payment and aggressively marketed the subject POA to unsophisticated consumers especially those of low or limited income who wanted a home not as an investment but with the intent of having a home as a long-term or life-long residence.

21.     The reason for such marketing is fairly simple: the low "teaser" monthly payments that these POA loans would give to such consumers. By the right mathematical manipulation of interest rates and of back-ending most of the principle payments into the last ten years of a loan, the initial monthly payments can be made so low as to almost qualify anyone for any loan. These

loans were marketed to the Plaintiff and to other consumers as somehow being able to save them money in the long-term. Such "savings" were in theory mathematically possible, however, they would actually occur only if the consumer could afford the eventual bi-weekly payments based on the increasing <u>not</u> decreasing principle that in a couple or at most a few years — sometimes in a few months – would actually be three to four times the initial low teaser rate.

22.     Given that consumers such as the Plaintiff could barely and many times could not really afford (because often such as in this case the Defendant's agents fraudulently inflated the borrower's income or ignored such inflation by a mortgage borrower in order to get a loan approved) the initial teaser rate, there was no way that consumers in the Plaintiff's position could afford the higher mortgage payments.

23.     Realistically, within months to a few years at most, consumers were left with only three options: sell the property; refinance/modify the loans at terms set by World Savings, default leading to foreclosure. The first two options were dependent on two conditions existing: 1) the same or lower interest rates; 2) a real estate market rising at a higher rate than the increasing principle. The first condition is almost meaningless given that prime rates were almost at 1% in the relevant time period; for practical purposes they could get no lower and at best one could only hope that they would stay the same and never increase. Unfortunately, the second condition went bust during the relevant time period of this Action. Therefore, the Leonellis' and all consumers similarly situated were left with only one option: default leading to foreclosure.

24.     Plaintiffs have been borrowing money from family and friends and from credit cards for over a year to try to stay current on the ever increasing monthly mortgage payments as they come due and were finally unable to do so and now as of on or about this month face foreclosure or a forced sale of their home.

25.    The significant fact is that these three options are a necessary part of the very structure of the subject loans once they become predatory by being marketed to unsophisticated consumers and World Savings offered commissions to its loan officers and underwriters based on the volume of loans approved by those officers and underwriters, thereby incentivizing approval of loans that World Savings knew or should have known could not be repaid.

26.    In addition, Plaintiff's note and loan documents stated that Plaintiff's monthly mortgage payments would be used to pay principal and interest. However, because this loan had negative amortization from its very first payment, Plaintiff's monthly payments for a significant part of the loan were used only to pay interest and not principal in breach of the note and loan documents.

27.    As a result of the above referenced unfair and deceptive acts, instead of purchasing property and receiving equity that the Leonellis' could afford in Massachusetts that was readily available at the time of the purchase of the subject property, the Leonellis' became debtors on this subject loan that was guaranteed to fail and result in default and now a threat of foreclosure by Defendant. As could have easily been predicted by Defendant's predecessor originating lender, Plaintiffs are not able to made the mortgage payments and the home is now under threat of foreclosure by Defendant despite their borrowing to make payments with the resulting damages: a) the lost of  equity and wasted interest payments; b) irreparable damage to their credit history; c) the emotional distress of losing a family home.

## CLASS ACTION ALLEGATIONS

28.    The subject financing of the Plaintiff's home occurred through what World Savings Bank called its "Pick-a-Payment" loan program that is more commonly known in the business of financing as Payment Option Arms (POAs).  Other members of the class that the Plaintiff will

seek to represent are Massachusetts residents and debtors nationwide who also received POAs from World Savings.  Defendant Wachovia is the successor in interest to World Savings by merger.

29.    The POAs were intentionally designed to result in negative amortization and obligations to pay compound interest.

30.    These loans seemed attractive and were made attractive to consumers by World Saving's deceptive and unfair advertizing because of the low initial payments and the prospect of refinancing in a few years after equity was built up in a home primarily after appreciation in the home value.  What the deceptive advertizing hid from all consumers was that if appreciation did not occur or interest rates went up instead of down during even the beginning history of the loan that refinancing would not be an option either because the home did not appreciate or because interest rates increased.  The low monthly payments do not cover the interest cost and the remainder interest gets added to the value of the loan.  So, the amount owed actually goes up over time and can easily surpass the value of a house in a zero money down situation.

31.    Plaintiffs' case is typical and characteristic of all POA's given by World Savings.

32.    In short, the POAs were designed to make fully amortizing payments unaffordable to the Plaintiff and to other consumers making the Plaintiff's and all other consumers' ability to pay-off the loan completely dependent on Wachovia's willingness to temporarily or permanently restructure their loans.

33.    POAs have been aggressively pressed on to unsophisticated borrowers as a way to borrow more money with temporarily and artificially low monthly payments.  Nearly $750 billion in

these loans was issued between 2004 and 2007 according to  Ruth Simon, <u>Option Arms See</u> <u>Rising Defaults</u>, *Wall Street Journal*, A1, January 30, 2009.

34.     POAs are a substantial cause of defaults and foreclosures.  *Id*; Susan E. Barnes, Patrice Jordan, Victoria Wagner & David Wyss, *Standard & Poor's 12*, <u>Standard & Poor's Weighs in on</u> <u>the U.S. Subprime Mortgage Market</u>  (Apr. 5, 2007) (increase in early payment defaults within four months of origination), available at www2.standardandpoors.com/spf/pdf/ media/TranscriptSubprime_040507.pdf.

35.     As of December 2008, 28% of option ARMs were delinquent or in foreclosure, according to LPS Applied Analytics, a data firm that analyzes mortgage performance.  Nearly 61% of POAs originated in 2007 will eventually default, according to a recent analysis by Goldman Sachs. Goldman further estimates that more than half of all POAs originated in any year will default. Ruth Simon, <u>Option Arms See Rising Defaults</u>, *Wall Street Journal, A1* January 30, 2009.

36.     In a POA loan, a borrower has, in theory, a choice of three payments:  a minimum non-amortizing payment; an interest only payment that covers the actual interest accruing; and a fully amortizing payment.  In practice, because the loans are sold to borrowers of limited means, three-quarters of all borrowers pay only the minimum payment, thus generating negative amortization.  Indeed, these borrowers can afford to make only the minimum monthly payment – an amount that will never pay off the loan.  Hous. Studies, State of the Nation's Housing 2007, at p. 17, available at http://www.jchs.harvard.edu/publications/ markets/son2007/son2007.pdf.  *See also* Economist.com, Ticking time bomb (Aug. 14, 2008) (loans recast after a set period), available at http://www.economist.com/finance/ displaystory.cfm?story_id=11921871; Lower extremities Christie, CNN Money.com, Pick-a-payment loans turn poisonous (Sep. 3, 2008) (more than 65% of option ARM borrowers make only minimum payments), available at

http://money.cnn.com/2008/09/02/real_estate/ pick_a_poison/index.htm.

37.     Once POA principal caps are reached (typically at 110% to 125% of principal), the borrower must pay an amount sufficient to pay off the loan in the remaining time of the loan term.  This means that if the original loan term was thirty years, and the remaining term is now twenty-five years, the aggregate principal plus accrued (unpaid) interest will be amortized over the remaining twenty-five years of the loan.  See e.g. USA Today, 'Pick-a-payment' Mortgage Risks are High, July 18, 2005 available at http://www.usatoday.com/money/perfi/ columnist/block/2005-07-18-pick-a-payment_x.htm.

38.     The combination of negative amortization and forced payment restructuring including interest coming due on unpaid interest results in significantly higher payment obligations thirty to sixty months after loan consummation.

39.     POA loans are complex.  They involve concepts that are unfamiliar and confusing to most, even fairly sophisticated, homeowners.  See e.g. Consumer Fed'n. of America press release, Lower-Income and Minority Consumers Most Likely to Prefer and Underesttimate Risks of Adjustable Mortgages 3, July 26, 2004, (consumers cannot calculate the interest in the payment in an adjustable rate mortgage and minimize the interest rate by understating the increase in the payment) available at http://www.consumerfederation.org/ releases.cfm#Consumer%20Literacy; Business Week, Nightmare Mortgages (Sep. 11, 2006) (option ARM "might be the riskiest and most complicated home loan produce ever created") available at http://www.businessweek.com/magazine/content/06_37/b4000001.htm.

40.     Lenders, including World Savings, made these loans knowing that borrowers cannot afford the fully indexed rate or the anticipated fully amortizing payments.  Subprime Mortgage

Market Turmoil:  Examining the Role of Securitization, Hearings Before the S. Comm. On Banking, Hous., & Urban Dev., 110th Cong. (2007) (statement of Sandor Samuels, Executive Managing Dir., Countrywide Fin. Corp.) (60% of borrowers from Countrywide could not qualify at the fully indexed rate).  Seven Sloan & Joe Adler, How Freddie Cutbacks in Hybrids May Reverberate, Am. Banker, Feb. 28, 2007 (quoting Wright Andrews, a lobbyist for nonbank lending institutions, as saying that most subprime borrowers cannot afford the fully indexed rate and requiring underwriting to the fully indexed rate would prevent adjustable rate mortgages from being made).

41.    On information and belief, hundreds of Massachusetts homeowners have POAs originated by World Savings and now owned by Wachovia that will ultimately require payments that those homeowners cannot afford.

42..    The subject adjustable rate notes have the following deceptive features:  1) a statement that the interest rate on the loan would be at a "yearly rate" when any such stated rate would only be in effect for less than a few months; and 2) a failure to admit that the stated payments would most definitely and not just "may" lead to negative amortization thereby triggering a complicated annual payment change regime that could only lead to substantial and unmanageable upward-only payment changes.

43.    Based on information in its possession, World Savings knew or should have known that consumers who could not afford payments that would amortize the loan would ultimately either require further refinancing, forced sale of the property, or default.

44.    The interest rate is based on a margin and an index that the Defendant has unlimited discretion to change at will.  Use of the term "Index" is deceptive in that the Index is not fixed by

then or any present "current" market conditions and remains, at all times relevant to this Action, entirely within the control of the World Savings and/or its successors in interest under the loan note.

45.     World Savings knew or should have known that the note language describing the Index would be impenetrable to its average customer.  Moreover, it knew that borrowers would not be able to obtain information to evaluate the index in order to compare a World Savings Loan to other available loan products.  Nor would customers, in light of the possibility of a change to an alternative index, rely on available information about the index.

46.     Thus, the Plaintiff and other World Savings customers were deprived of an opportunity to understand the consequences of a World Savings Loan, could not comparison shop, and could not evaluate the likely cost of future mortgage payments under the loan as designed. The note language was designed to obscure the actual rate that would be applied to the transaction so that typical borrowers, such as the Plaintiff, would be forced to focus on the temporary interest rate and the deceptive advertizing that they would save for example $80,000 over the life of a loan.

47.     Thus, the note is deceptive and intended to deceive about the interest rate applicable to the transaction. In addition, the note is unfair in that World Savings retained discretion to change the Index to its advantage at any time.

48.     The note is unfair in the circumstances because it binds the Plaintiff and other consumers to a loan structure they could not understand.

49.     The payment change provisions of the note are complex and interrelated. World Savings knew or should have known that this language concerning payments would be impenetrable to its

average customer.

50.     The note language was designed to obscure the actual payments that would be due to amortize the loan in the transaction so that typical borrowers, such as the Plaintiff, would be forced to focus on the initial payments that would be in effect for only a short time (and which would result in negative amortization requiring an upward payment adjustment).

51.     The note calls for and the Plaintiff and class members have incurred and/or have paid or will pay illegal compound interest.

52.     The note is deceptive and intended to deceive with respect to the amount of monthly payments.

53.     The note is also unfair because it deprives typical borrowers, such as the Plaintiff, of information necessary to evaluate their long-term ability to amortize the debt.

54.     It is unfair under Massachusetts law for a lender to make a home mortgage loan secured by the borrower's principal residence in circumstances where the lender does not reasonably believe that the borrower will be able to make the scheduled payments and avoid foreclosure.

55.     World Savings owed the Plaintiff and other similarly situated borrowers a duty of care to underwrite the loan by considering whether the loan could eventually be paid off by amortizing payments.

56.     Rather than underwrite the loan properly, World Savings considered only whether the Plaintiff and other similarly situated borrowers could make the initial monthly payment and

aggressively marketed the subject POA to unsophisticated consumers especially those of low or limited income who wanted a home not as an investment but with the intent of having a home as a long-term or life-long residence. The reason for such marketing is fairly simple: the low "teaser" monthly payments that these POA loans would give to such consumers. By the right mathematical manipulation of interest rates and of back-ending most of the principle payments into the last ten years of a loan, the initial monthly payments can be made so low as to almost qualify anyone for any loan. These loans were marketed to the Plaintiff and to other consumers as somehow being able to save them money in the long-term. For example, Defendant's agents told the Plaintiff as they told many other consumer that over the 30-year history of the loan that a POA would actually save him $80,000 over a fixed rate loan.

57.    Such "savings" were in theory mathematically possible, however, they would actually occur only if the consumer could afford the eventual bi-weekly payments based on the increasing not decreasing principle that in a couple or at most a few years — sometimes in a few months – would actually be three to four times the initial low teaser rate. Given that consumers such as the Plaintiff could barely and many times could not really afford (because often such as in this case the Defendant's agents fraudulently inflated the borrower's income or ignored such inflation by a mortgage borrower in order to get a loan approved) the initial teaser rate, there was no way that consumers in the Plaintiff's position could afford the higher mortgage payments.

58.    Realistically, within months to a few years at most, consumers were left with only three options: sell the property; refinance/modify the loans at terms set by World Savings, default leading to foreclosure. The first two options were dependent on two conditions existing: 1) the same or lower interest rates; 2) a real estate market rising at a higher rate than the increasing principle. The first condition is almost meaningless given that prime rates were almost at 1% in the relevant time period; for practical purposes they could get no lower and at best one could only

hope that they would stay the same and never increase. Unfortunately, the second condition went bust during the relevant time period of this Action. Therefore, the Plaintiff and all consumers similarly situated were left with only one option: default leading to foreclosure. In one last desperate attempt to avoid default and foreclosure, as occurred with this Plaintiff, a consumer would be forced to accept a coerced modification that changed none of the unfair and deceptive structuring of the loan, that would again eventually lead to another default and foreclosure, but that contained a hidden fraudulent "release" of the very same unfair and deceptive acts.

59.    The significant fact is that these three options are a necessary part of the very structure of the subject loans once they become predatory by being marketed to unsophisticated consumers and World Savings offered commissions to its loan officers and underwriters based on the volume of loans approved by those officers and underwriters, thereby incentivizing approval of loans that World Savings knew or should have known could not be repaid.

60.    World Savings knew or should have known that its POA loans would almost always result in default and foreclosure unless the borrower refinanced or sold the property and furthermore that it is factually impossible to satisfy TILA requirements for these loans because the subject loans are not actually indexed and therefore cannot lead to an honest TILA.

61.    Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated pursuant to *Fed.R.Civ.P.23*.

62.    The Class represented by the Plaintiffs consists of all Massachusetts residents who entered into a Payment Option Arm "pick-a-payment" mortgage loan with Wachovia or any of its predecessors on or after five years prior to the date of this Complaint.

63.    The Class is such that:

    (1)    the class is so numerous that joinder of all members is impracticable;

    (2)    there are questions of law or fact common to the class;

    (3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    (4)    the representative parties will fairly and adequately protect the interests of the class.

64.    The Class satisfies *F.R.Civ.P. Rule 23(a)* and:

    (1)    prosecuting separate actions by or against individual class members would create a risk of:

        (A)    inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

        (B)    adjudication with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

    (2)    the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

    (3)    questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

65.    There are questions of law and fact common to all members of the class, which questions

predominate over any question affecting only individual class members.

66.    The principal common issues are:

a.    whether the structure of the POA transactions at issue is unfair and violative of *G.L. 93A, § 2* and/or unconscionable;

b.    whether the loan notes in the POA transactions at issue are unfair and/or deceptive within the meaning of *G.L. 93A, § 2* and/or unconscionable;

c.    whether the description of payment options in the POA transactions at issue are unfair and/or deceptive within the meaning of *G.L. 93A, § 2* and/or unconscionable;

d.    whether the loan contracts at issue contain illegal and unenforceable terms;

e.    whether use of POAs was designed to result in profitable fees and costs and/or additional payments of interest on interest through repayment plans and refinancing arrangements resulting from duress; and

f.    whether World Savings was negligent in its underwriting practices for POAs.

g.    whether Defendant's unfair and deceptive loan modifications are themselves a separate source of liability and that need to be stopped by equitable action.

67.    The only individual questions concern the identification of members of each class and the computation of relief to be afforded each class member that can be determined by a ministerial examination of the relevant account records.  Notice can be provided to the class by various means of communication, as identified in the Defendant's computerized databases of customers.

68.    Plaintiff's claims are typical of the claims of class members.  All are based on the same

legal and remedial theories.

69.    Plaintiff will fairly and adequately protect the interests of all class members in the prosecution of this action and in the administration of all matters relating to claims stated herein. They are similarly situated with, and have suffered similar injuries as, the members of the class they seek to represent. Neither the named Plaintiff nor their counsel have any interest that might cause them not to vigorously pursue this action.

70.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, in that:

      a.     the losses suffered by the class members are such that prosecution of individual actions is impractical or economically unfeasible;

      b.     by contrast, the illegal profits obtained by the Defendant as a result of its unlawful practices are substantial;

      c.     the form of proof required is such that prosecution of individual actions is impractical or economically infeasible;

      d.     in the absence of the class action device, the Plaintiffs and Class Members would be left without a remedy for the wrongful acts alleged, and the Defendant would be unjustly enriched.

      e.     the prosecution of separate lawsuits by individual members of the class would create the risk of inconsistent adjudications with respect to individual class members, which would establish incompatible standards of conduct for the Defendant, making concentration of the litigation concerning this matter in this Court desirable;

      f.     the claims of the representative Plaintiff is typical of the claims of the class; and

g.    no unusual difficulties are likely to be encountered in the management of this action as a class action.

71.    The class in so numerous as to make it impracticable to join all members of the class.

72.    Because Plaintiff's claims derive or are based on an installment contract payable monthly, the limitations period for Plaintiffs' claims begin to run monthly when each installment was due. *Berezin v. Regency Savings Bank*, 234 F.3d 68 (1st. Cir. 2000)*.*

## COUNT I - UNJUST ENRICHMENT

73..    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

74.    As a result of Word Savings'/Defendant's predatory lending practices, Plaintiff conferred a massive financial benefit upon the Defendant.  Defendant has been unjustly enriched at the expense of Plaintiff.  It would be unjust for the Company to retain such amounts.

75.    By reason of the foregoing, Plaintiff seeks restitution from Defendant and an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

## COUNT II - EQUITABLE RELIEF

76.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

77.    The Plaintiffs will be irreparably injured in the future by the Defendant's misconduct through any foreclosure, the outstanding loan note, and the bad credit history caused by the subject note default.

78.    Plaintiffs seek a judgment with adequate equitable remedies, including, without limitation, rescission or reformation of his loan note and modification, and an injunction ordering the removal of the loan from his credit history, and stopping any foreclosure.

79.    Plaintiff does not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint and will suffer irreparable injury as a result of the Defendant's misconduct unless equitable relief is granted.

80.    By reason of the foregoing, Plaintiffs are entitled to equitable relief as set forth herein and for any further equitable relief as determine necessary by the Court.

## COUNT III -

## VIOLATION OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

81.    Plaintiffs restate and reallege the averments contained in all preceding paragraphs as if fully set forth herein.

82.    Defendant's agents as alleged herein have violated the covenant of good faith and fair dealing implied in every contract negotiated and executed in the Commonwealth of Massachusetts.

83.    Defendant is vicariously liable for such violations.

## COUNT IV -

## VIOLATION OF MASS. G.L. C. 93A

84.    Plaintiffs restate and reallege the averments contained in all preceding paragraphs as if fully set forth herein.

85.    Defendant through its agents for which it is vicariously liable as alleged herein has willfully engaged in unfair and deceptive trade practices in violation of *Mass. G.L. c. 93A*.

Defendant has failed to make a reasonable settlement offer in response to Plaintiff's demand for such pursuant to *G.L.c. 93A, §9.*

## COUNT V - NEGLIGENCE / MASSACHUSETTS STATUTORY DUTIES

85.    Plaintiff restates and realleges the averments contained in all preceding paragraphs as if fully set forth herein.

86.    The Commonwealth of Massachusetts laws establish a required standard of care for the Defendant and all its agents involved in the above referenced transactions. The Defendant and all its agents breached the required standard of care and the required duties of associated state law.

## COUNT VI - NEGLIGENCE / FEDERAL STATUTORY DUTIES

87.    Plaintiff restates and realleges the averments contained in all preceding paragraphs as if fully set forth herein.

88.    The federal law establishes a required standard of care for the Defendant and all its agents involved in the above referenced transactions.

89.    The Defendant and all its agents breached the required standard of care and the required duties of associated federal law.

## COUNT VII - BREACH OF CONTRACT

90.    Plaintiffs restate and reallege the averments contained in all preceding paragraphs as if fully set forth herein.

91.    The Defendant and all its agents breached the contractual requirements of the

subject notes and mortgages of this Action to pay principal on the subject loans of this Action.

WHEREFORE, the Plaintiff demands:

(1) damages in an amount determined by the court;

(2) attorneys' fees and costs;

(3) treble damages;

(4) equitable relief;

(4) granting such other and further relief as the court deems just and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES.**

Plaintiff by his attorney,

/s/ Valeriano Diviacchi
BBO# 555940
Diviacchi Law Office
111 Beach Street  #1A
Boston, MA 02111-2532
617-542-3175

Date: 1 December 2009